**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>**NEW ENGLAND ANTI-VIVISECTION**</td><td></td><td></td></tr>
<tr><td>**SOCIETY**, *et al.*,</td><td>*</td><td></td></tr>
<tr><td>**Plaintiffs,**</td><td>*</td><td></td></tr>
<tr><td>**v.**</td><td></td><td>**Case No.: GJH-20-2004**</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>**GOLDENTYER**, *et al.*,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>**Defendants.**</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs New England Anti-Vivisection Society ("NEAVS")[1] and Animal Legal

Defense Fund ("ALDF") brought this civil action against Defendants Elizabeth Goldentyer, the

Acting Deputy Administrator for Animal Care at the Animal Plant and Health Inspection Service

("APHIS"), and Sonny Perdue, the Secretary of the United States Department of Agriculture

("USDA"), challenging APHIS's refusal to upgrade the standards for the psychological well-

being of primates used in laboratory research under the Administrative Procedure Act ("APA")

and requesting declaratory and injunctive relief. ECF No. 1. Pending before the Court is

Defendants' Motion to Dismiss. ECF No. 7. No hearing is necessary. *See* Loc. R. 105.6 (D. Md.

2021). For the following reasons, Defendants' Motion to Dismiss is denied.

---

[1] Since this case was filed, NEAVS has changed its name to Rise for Animals. ECF No. 10 at 5 n.1. However, for the convenience of the parties, Plaintiffs have continued to use the name NEAVS in their filings. *Id.* The Court will do the same.

I.      BACKGROUND[2]

A.      Statutory and Regulatory Background

1.      The Animal Welfare Act and Related USDA Regulations

Congress originally enacted the Animal Welfare Act ("AWA") in 1966 to "[e]nsure that animals intended for use in research facilities . . . are provided humane care and treatment." 7 U.S.C. § 2131(1). Specifically, the AWA directs the Secretary of the USDA to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors" *Id.* § 2143(a)(1).

However, in 1985, based on studies conducted by primatologist Jane Goodall and others, Congress recognized that additional laws were needed to adequately protect nonhuman primates. ECF No. 1 ¶ 25. Recognizing that nonhuman primates have psychological and social needs that are critical to their well-being, Congress acknowledged that the standards at that time left "too much room for shoddy care and inhumane treatment." 131 Cong. Rec. 22257 (Aug. 1, 1985) (statement of Sen. Chafee). Congress determined that, in order to adequately provide for the unique psychological needs of nonhuman primates, there was a need for specific standards for dealers, research facilities, and exhibitors. ECF No. 1 ¶ 26; 131 Cong. Rec. 22257 (Aug. 1, 1985). Thus, Congress enacted the Improved Standards for Laboratory Animals Act, which amended the AWA by specifically requiring that the Secretary of the USDA promulgate minimum requirements to ensure that research facilities provide "a physical environment adequate to promote the psychological well-being of primates." 7 U.S.C. § 2143(a)(2)(B). In amending the AWA, Congress sought to require the USDA to develop "uniform standards in

_____

[2] Unless otherwise stated, the background facts are taken from Plaintiffs' Complaint, ECF No. 1, and are presumed to be true.

order that [there] might [be] a consistent national policy to assure appropriate care and use of laboratory animals, while not jeopardizing research needs." 131 Cong Rec. S14237 (daily ed. Oct. 28, 1985) (statement of Sen. Hatch).

In 1991, the USDA promulgated regulations intended to implement the 1985 amendment. 9 C.F.R. § 3.81. Those regulations allow the regulated entities, including research facilities, to develop, document, and follow their own "plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates." *Id.* Each facility's plan "must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." *Id.* Additionally, the regulations require each plan to address the following topics: (1) "the social needs of nonhuman primates of species known to exist in social groups in nature[;]" (2) environmental enrichment, including requiring physical environments in the primary enclosure to be enriched by "providing means of expressing noninjurious species-typical activities[;]" (3) special considerations for specific categories of nonhuman primates, including infant and young nonhuman primates; and (4) the use of restraint devices. *Id.* However, the regulations do not provide any guidance on how the facilities' plans must address these categories, nor do they require a facility's enrichment plan to be pre-approved by the USDA. *See id.* In fact, facilities are not required to submit enrichment plans to the USDA. *Id.*; ECF No. 1 ¶¶ 30–31. According to Plaintiffs, these regulations "leave facilities with unbridled discretion to determine what goes into each of their plans." *Id.* ¶ 30.

In 1996, after five years of enforcing the USDA's 1991 regulations, the Animal Plant Health Inspection Service ("APHIS")[3] issued a report documenting that many of its inspectors

---

[3] APHIS is an agency of the USDA and is responsible for enforcing the USDA's 1991 regulations.

found that "dealers, exhibitors, and research facilities did not necessarily understand how to develop an environment enhancement plan that would adequately promote the psychological well-being of nonhuman primates" and that there was "confusion among the regulated public concerning on what basis they will be judged by inspectors as meeting or not meeting requirements." 64 Fed. Reg. 38146 (July 15, 1999). As a result, APHIS concluded that additional information on how to meet the standards in 9 C.F.R. § 3.81 was necessary. 64 Fed. Reg. 38146. Specifically, regulated entities needed more specific guidance about the five general elements that are "critical to environments that adequately promote the psychological well-being of nonhuman primates": (1) social grouping; (2) social needs of infants; (3) structure and substrate; (4) foraging opportunities; and (5) manipulanda. *Id.* To provide this guidance, in 1999, APHIS formulated a "Draft Policy" intended "to be used by dealers, exhibitors, and research facilities as a basis in developing plans under § 3.81 for environmental enhancement to promote the psychological well-being of nonhuman primates." *Id.* APHIS published the Draft Policy in the Federal Register on July 15, 1999, explaining that it was "seeking public comment on the draft policy" before implementing it. *Id.* at 38145.

Prior to APHIS's development and publishing of its Draft Policy, several animal protection organizations challenged the sufficiency of the 1991 regulations in federal court. *See, e.g.*, *Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229 (D.C. Cir. 2000). In the context of one of these federal cases, the D.C. Circuit, while holding that the regulations were not arbitrary and capricious, acknowledged that the 1991 regulations "may prove difficult to enforce, or even difficult to augment through subsequent 'interpretation.'" *Id.* at 235. The D.C. Circuit's concern, however, was ameliorated by the fact that APHIS was then in the process of finalizing the 1999 Draft Policy, which the Court found would be "likely to assist both regulators and enforcers" in

determining the minimum steps that were required to promote the psychological well-being of primates. *Id.* But the Draft Policy was never finalized nor implemented. ECF No. 1 ¶ 35. Instead, no changes have been made to the primate regulations since they were first promulgated thirty years ago, despite APHIS's acknowledgement that such changes were "necessary[.]" 64 Fed. Reg. 38146.

Although the USDA has not updated its regulations since 1991, in the past three decades a substantial body of scientific evidence has been generated demonstrating the psychological capabilities and needs of primates, the ethical responsibilities of humans towards these animals, and the adverse impacts on scientifically valid research when the psychological well-being of primates is compromised. ECF No. 1 ¶ 36. Specifically, nonhuman primates "have active minds and inquisitive natures; are inventive and sociable; develop caring relationships with others; make and use tools; develop rudimentary cultures; have complex emotions; analyze past results; imagine different outcomes; experience regret; appear to understand others' perceptions, thoughts, and feelings; and have a sense of justice and fairness." *Id.* ¶ 37. However, primates living in artificial environments, exposed to constant and unpredictable stressors, develop pathological behaviors and suffer severe stress due to their confinement, lack of access to social or mental enrichment, and lack of control over their environment. *Id.* ¶ 38. In response to this stress, primates in research facilities commonly engage in abnormal behaviors, including self-harm and self-mutilation. *Id.* ¶ 39. Despite this new body of knowledge, under the current regulations, primates, according to Plaintiffs, continue to be housed in conditions that are extremely detrimental to their psychological well-being. *Id.* ¶ 40.

### 2.    The National Institutes of Health Upgrades Standards for Chimpanzees

In December 2010, at the request of the National Institutes of Health ("NIH") and in

collaboration with the National Research Council, the National Academy of Medicine convened

a Committee on the Use of Chimpanzees in Biomedical and Behavioral Research to consider the

necessity of using chimpanzee in NIH-funded research. ECF No. 1 ¶ 41. The Committee's

Report, completed a year later, discussed the need for "ethologically appropriate physical and

social environments" for such primates—*i.e.*, "captive environments that do not simply allow but

also, importantly, promote a full range of behaviors that are natural for chimpanzees." 78 Fed.

Reg. 39741, 39742, 39743. In response to the Committee's report, the NIH Council of Councils

("CoC") formed a Working Group on the Use of Chimpanzees in NIH-Supported Research. ECF

No. 1 ¶ 42. After several years analyzing the use of chimpanzees in research, the Working Group

concluded in their final recommendations—which were unanimously approved by the full

CoC—that any and all potential future use of chimpanzees must be subject to a strict

independent oversight committee to assess whether that use is acceptable, necessary, and

compliant with National Academy of Medicine guidelines, including housing the primates in

ethologically appropriate environments. *Id.* The CoC submitted its report to NIH, and, on June

26, 2013, after considering public comments, the NIH accepted nearly all the CoC's findings,

including nine of ten recommendations regarding ethological appropriate environments. *Id.* ¶ 43.

Therefore, although all federally funded laboratories were already required to follow all

applicable AWA standards, including the USDA's 1991 regulations regarding the psychological

well-being of primates, NIH determined in 2013 that additional requirements were needed to

meet the psychological needs of chimpanzees. *Id.* ¶ 44.

    The NIH-adopted requirements provide concrete minimum standards for environments in

which chimpanzees are held, including standards to address specific physical and social needs.

*Id.* ¶ 43. In fact, many of the NIH-adopted requirements correspond to the same elements that

APHIS included in its 1999 Draft Policy as "critical" to promote psychological well-being of all primates. *Id.* ¶ 45. The NIH requirements provide that chimpanzees must have the opportunity to live in social groupings; have access to the outdoors and natural substrates; have the opportunity to forage and have varied diets; have the ability to climb and rest in elevated spaces; be provided the opportunity to build nests; and have the opportunity to make choices. *Id.* The NIH requirements also mandate that management staff at the facilities where chimpanzees are held must include experienced and trained behaviorists and enrichment specialists and must receive training in core institutional values promoting the psychological and behavioral well-being of the chimpanzees in their care. *Id.* These NIH-adopted standards are more specific and, arguably, more stringent that the USDA's regulations, despite the USDA and NIH having a history of working together to ensure harmonized animal welfare requirements. *See id.* ¶ 446; *see also* 7 U.S.C. § 2145.

### B.      Factual Background

#### 1.      Plaintiffs

Plaintiff NEAVS is a nonprofit organization whose mission is to save animals from suffering. ECF No. 1 ¶ 6. Specifically, one of NEAVS's primary purposes is to end the suffering of nonhuman primates used in research. *Id.* Towards this end, NEAVS works to educate the public, lawmakers, and others about the needs of primates used in research and the suffering they endure. *Id.* NEAVS's most significant campaign for nonhuman primates focuses on exposing and educating the public about the substantial inhumane treatment these animals endure in research laboratories. *Id.* ¶ 11. This campaign requires NEAVS to regularly submit Freedom of Information Act ("FOIA") requests for APHIS inspection records, annual reports by research facilities, and reports by the facilities' Institutional Animal Care & Use Committees, the entities

mandated by the AWA to oversee the treatment of animals used in research. *Id.*

Plaintiff ALDF is another nonprofit organization with a similar mission to NEAVS's. *Id.*
¶ 14. ALDF works to protect the lives and advance the interests of animals through the legal
system. *Id.* ALDF accomplishes its mission by engaging in litigation, providing legal assistance
and training to prosecutors, supporting strong animal protection legislation, combating
legislation harmful to animals, and providing resources and opportunities to law students and
professionals to advance the emerging field of animal law. *Id.* Relevant to this case, ALDF
engages in communications campaigns to highlight the failure of laboratories to provide proper
care for primates, has filed comments with the NIH urging the agency to adopt a proposal to
severely restrict the research on captive chimpanzees, and has been involved in litigation to
improve the welfare of primates used in the research field. *Id.* ¶ 15. To achieve its mission,
ALDF often relies on information generated from public records requests—including AWA
inspection reports and other regulatory records—to investigate problematic facilities. *Id.*

## 2.    Plaintiff's Rulemaking Petition

On May 7, 2014, Plaintiffs submitted a Petition for Rulemaking to the USDA. ECF No. 1
¶ 47. Pursuant to AWA's mandate that the USDA promulgate standards that set "minimum
requirements . . . for a physical environment adequate to promote the psychological well-being
of primates[,]" 7 U.S.C. § 2143(a)(2)(B), Plaintiffs' Petition requested that the USDA adopt the
same minimum standards that NIH has adopted for chimpanzees used in federally funded
research for all nonhuman primates used in research, whether federally funded or not. ECF No. 1
¶ 47. In their Petition, Plaintiffs documented that the current lack of clear and enforceable
standards is extremely detrimental to the psychological well-being of primates used in research,
provided examples of the prolonged and unnecessary suffering of specific primates due to

inadequacies in the current regulatory scheme, explained that other species of primates have psychological needs similar to those of chimpanzees, and included detailed expert information about how NIH's recommendations can be properly tailored and implemented for each primate species commonly used in research. *Id.* ¶¶ 47–51.

Plaintiffs' Rulemaking Petition also requested that the USDA promulgate regulations defining when primates experience psychological distress and delineating what steps must be taken to address such distress. *Id.* ¶ 53. In making this request, the Petition noted that the stress primates experience as a result of laboratory conditions can result in both psychological damage as well as severe physiological consequences for the primate; documented the harmful stereotypic behaviors in nonhuman primates that can result from stress; provided examples of extreme psychological distress suffered by individual primates as a result of the current regulatory framework; provided evidence demonstrating that, when these conditions are addressed, the primate's psychological condition can be dramatically improved; and explained that psychological distress experienced by primates used in research can have negative impacts on the scientific validity of the results of such research. *Id.* ¶¶ 53, 55–56.

The USDA was initially receptive to Plaintiffs' Rulemaking Petition. In May 2014, then Deputy Administrator for Animal Care, Chester Gipson, responded to Plaintiffs' Petition, stating, "[w]e believe that the issues raised in the petition are important and that many parties will have an interest in them." ECF No. 1 ¶ 58. The letter went on to inform Plaintiffs that the USDA would "publish the petition in a Federal Register notice in the near future to solicit public comment" and that once the USDA had analyzed all of the comments received, it would decide what action to take in response to Plaintiffs' request. *Id.*

A year later, in May 2015, APHIS published notice of the Rulemaking Petition in the

Federal Register, stating that it was "making this petition available to the public and soliciting comments regarding the petition and any issues raised by the petition that [APHIS] should take into account as [it] considered th[e] petition." 80 Fed. Reg. 24840, 24841 (May 1, 2015). APHIS then, in July 2015, published a second notice reopening the comment period to give interested persons additional time to submit comments. 80 Fed. Reg. 43969 (July 24, 2015). The second comment period ended on August 31, 2015. ECF No. 1 ¶ 59. APHIS received over 10,000 comments in total and 99 percent of the ones deemed responsive, a total of 7,232, supported granting Plaintiffs' Rulemaking Petition. *Id.* ¶¶ 60–61.

Five and a half years later, by letter from Defendant Goldentyer dated October 10, 2019, APHIS denied Plaintiffs' Petition, stating that no changes would be made to the existing 1991 regulations concerning the psychological well-being of primates. *Id.* ¶ 62. The denial letter stated—contrary to APHIS's 1996 Report and 1999 Draft Policy—that APHIS's "experience administering and enforcing the welfare standards related to environmental enhancement to promote psychological well-being demonstrated such standards are, in fact, enforceable." *Id.* ¶ 63. The denial letter: (1) did not address the 1999 Draft Policy; (2) failed to present any evidence that demonstrates that (a) APHIS inspectors were no longer having difficulty determining whether a particular facility's enrichment plan met the applicable psychological well-being standard, and (b) the regulated public was no longer confused about what was required to meet this standard; (3) did not address the fact that USDA's sister agency, NIH, had concluded in 2013 that USDA's existing standards were insufficient to promote the psychological well-being of chimpanzees used in federally funded research; and (4) did not respond to any of the 7,232 comments APHIS received in support of Plaintiffs' Petition. *Id.* ¶¶ 64–66, 71. The denial letter instead stated that APHIS does not need to promulgate more

10

detailed standards about what is required to promote the psychological well-being of primates because it held a symposium in 2017 titled "Practice Solutions to Welfare Challenges," and also issued several "Animal Care Aids" to "support . . . the development of compliant [Environmental Enrichment Plans]." *Id.* ¶ 68 (brackets in original).

However, Plaintiffs allege that the symposium on which APHIS relies in its denial letter was not attended by all, or even most, laboratories using primates in research, and, moreover, the information conveyed at the symposium and in the agency's various Animal Care Aids is non-binding. *Id.* ¶ 69. Plaintiffs also assert that APHIS has recently informed its inspectors that, when inspecting facilities accredited by the Association for Assessment and Accreditation of Laboratory Animal Care ("AAALAC"), they may choose which aspects of a particular facility they wish to inspect. *Id.* ¶ 70. Thus, inspectors are not even required to inspect all the animals, all aspects of the facility, or even the environmental enrichment plans currently being used by such facilities when completing the annual inspections that are required by the AWA. *Id.*; *see also* ECF No. 19; ECF No. 20.

### 3.    Alleged Harm to Plaintiffs

Plaintiffs allege that APHIS's denial of Plaintiffs' Rulemaking Petition frustrates and impairs Plaintiffs' missions to protect animals, including nonhuman primates used in research, from inhumane treatment. ECF No. 1 ¶¶ 7, 14, 16.

With respect to the harm to NEAVS, Plaintiffs allege that, as a consequence of Defendants' denial of their Petition, "NEAVS will have to divert additional resources . . . to obtain information about the ways [nonhuman primates used in research] are treated and what is being done to minimize their suffering." *Id.* ¶ 7. Specifically, the denial of Plaintiffs' Rulemaking Petition prevents NEAVS from "effectively monitor[ing] how primates are treated

in laboratories and whether APHIS is carrying out its statutory mandate to ensure their psychological well-being." *Id.* ¶ 11. APHIS's denial "deprives NEAVS of key information that it needs to educate the public about (a) the conditions under which primates are being maintained in laboratories; (b) whether they are suffering psychological distress; (c) if so, what measures are being taken to alleviate such suffering; and (d) whether APHIS is meeting its statutory obligation to 'ensure' the humane treatment of these animals." *Id.* "This denial of information in turn impairs NEAVS' overall campaign to protect these animals and advocate for their placement in sanctuaries, and to advocate for a transition to non-animal alternative testing protocols." *Id.* To attempt to remedy the harm caused by Defendants' denial of Plaintiffs' Petition, NEAVS will have to divert resources to "engage in additional investigations and information gathering[.]" *Id.* ¶¶ 8, 10.

Additionally, NEAVS alleges it is harmed by Defendants' denial because, after already spending considerable resources in an effort to convince APHIS to upgrade their standards regarding the treatment of nonhuman primates used in research, NEAVS will now have to divert resources to developing (1) "training programs for APHIS inspectors regarding how to identify primate behaviors that indicate distress, stress, and suffering, and what actions must be taken to promote the psychological enrichment of these animals[,]" and (2) training modules for veterinary students in order to educate the future veterinarians who will be working with these primates in research labs or as employees of the USDA about how to identify common signs of psychological distress and suffering in nonhuman primates. *Id.* ¶¶ 7–9.

With respect to harm to ALDF, Plaintiffs allege that Defendants' denial of Plaintiffs' Rulemaking Petition prevents ALDF from being able to easily "calibrate its advocacy to particular problematic facilities." *Id.* ¶ 15. Instead, ALDF must, as a result of the denial,

"conduct rigorous investigations to determine the inadequacy of primate enrichment at specific facilities." *Id.* Specifically, ALDF has to "spend additional time and resources investigating inadequate enrichment opportunities for nonhuman primates through other means in addition to submitting FOIA requests, or forgo knowledge of that important information entirely." *Id.* ¶ 17.

Moreover, Plaintiffs allege that the denial of Plaintiffs' Rulemaking Petition requires ALDF to (1) "spend more time and resources ameliorating substandard welfare of nonhuman primates used in research through law enforcement requests, regulatory action, public communications, and other means[,]" and (2) "divert significant resources to seek other means of protecting the psychological welfare of nonhuman primates that would not be necessary, or necessary to the same extent, had APHIS granted the Rulemaking Petition." *Id.* ¶ ¶ 17–18. Finally, due to Defendants' denial of Plaintiffs' Petition, ALDF will likely receive more complaints about primate facilities where animals are being neglected, and thus will have to expend more resources investigating these research facilities and working to ameliorate these concerns." *Id.*

### C.    Procedural Background

Plaintiffs initiated this action on July 9, 2020. ECF No. 1. Defendants filed the instant Motion to Dismiss on October 19, 2020, challenging Plaintiffs' Article III standing. ECF No. 7. Plaintiffs responded in opposition on December 4, 2020, ECF No. 10, and Plaintiffs replied on January 25, 2021, ECF No. 15. The parties have also filed several notices updating the Court on Fourth Circuit case law relevant to the Motion to Dismiss and clarifying earlier statements in previous filings. ECF Nos. 16, 17, 18, 19, 20, 21.

## II.   STANDARD OF REVIEW

Defendants move to dismiss the Complaint pursuant to Fed. R. Civ. P 12(b)(1), asserting

that Plaintiffs lack standing. A challenge to standing is, in effect, a challenge to the Court's subject-matter jurisdiction. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76 (1982). Plaintiffs have the burden of proving that subject-matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). When a defendant challenges subject-matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

## III.    DISCUSSION

"As the Supreme Court has consistently emphasized, Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies[,]" and "[t]he requirement that a [p]laintiff possess standing to sue emanates from that constitutional provision." *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 494–95 (4th Cir. 2021) (internal quotation marks omitted) (quoting *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 619 n.5 (4th Cir. 2018)).

The Article III standing doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant[s;]" and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v.*

14

*Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992); *see also Tri-State Zoological Park*, 843 F. App'x at 495. The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. And Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006). Organizational plaintiffs, like NEAVS and ADLF, can assert standing based on two distinct theories: (1) representational standing, where the injury is to the organization's members, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or (2) direct organizational standing, where the injury is to the organization itself, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). *See also Tri-State Zoological Park*, 843 F. App'x at 495 (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)). In the instant case, Plaintiffs argue that they have direct organizational standing.

The Court, when determining whether organizational standing exists, "conducts the same inquiry as in the case of an individual." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991). In other words, the Court must consider whether Plaintiffs have established the three elements of Article III standing discussed above. *See Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 361 (4th Cir. 2020) ("[A] mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient [to establish standing.]" (internal quotation marks omitted) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972))). Here, however, the parties only dispute the first and the third elements of Article III standing—*i.e.*, injury-in-fact and redressability. Causation is not in dispute. Thus, below, the Court will first discuss whether Plaintiffs have suffered an injury-in-fact, and then—finding that Plaintiffs have alleged such an injury—will discuss whether that injury would be redressed by a favorable decision.

A.      **Injury-in-Fact**

1.      **What Constitutes an Injury-in-Fact?**

With respect to the first element of standing, injury-in-fact, "an organization that 'seek[s] to do no more than vindicate [its] own value preferences through the judicial process' cannot establish standing[.]" *Tri-State Zoological Park*, 843 F. App'x at 495 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)). Organizations, like Plaintiffs, however, "may suffer injury in fact when a defendant's actions impede [their] efforts to carry out [their] mission." *Id.* (internal quotation marks omitted) (quoting *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012)). Specifically, the Fourth Circuit has held "that a[n organizational] plaintiff has suffered an organizational injury if the challenged policy or practice frustrates both [the organization's] purpose and caused a drain on its resources." *Id.* (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 183 ("[A]n injury to organizational purpose, without more, does not provide a basis for standing.")); *see also Havens Realty Corp.*, 455 U.S. at 379 ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources— constitutes far more than simply a setback to the organization's abstract social interests[.]"); *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) ("The United States Supreme Court has made clear, however, that if the defendant's allegedly wrongful action prompts an organization to increase[] the resources [it] must devote to programs independent of its suit against the defendant, the organization has shown an injury in fact." (internal citations and quotation marks omitted) (brackets in original)). Nevertheless, "[t]he mere fact that an

organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (citation omitted); *see also Lane*, 703 F.3d at 675. "[A]n organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflected' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)).

A recent Fourth Circuit case, issued earlier this year, illustrates the circumstances in which a court may find organizational standing to exist. In *Tri-State Zoological Park*, the Fourth Circuit determined that People for the Ethical Treatment of Animals ("PETA") had organizational standing to challenge a zoo's inhumane treatment of eight animals in captivity. 843 F. App'x at 495. In finding organizational standing, the Fourth Circuit observed that "PETA's mission is to protect animals from abuse, neglect, and cruelty" and that "PETA pursues this mission through several programs, including public education, cruelty investigations and research, the rescue of animals, and protest campaigns." *Id.* at 496. The Fourth Circuit further observed that the defendants' misconduct "increased animals subject to abuse and created the misimpression that the conditions in which the animals were kept were lawful and consistent with animal welfare." *Id.* Additionally, as a result of the defendants' conduct and in accordance with PETA's mission-based requirement to protect and rescue animals from abuse and neglect, PETA "devoted its resources to submit complaints about Defendants to government agencies, compile and publish information about Tri-State's treatment of animals, and to investigate and

monitor" the defendants. *Id.* Based on these observations, the Fourth Circuit held that PETA had

been injured-in-fact because PETA's "diversion of resources impeded PETA's efforts to carry

out its mission by reducing its ability to engage in mission-related campaigns against other zoos"

and, thus, the defendants' conduct "'perceptibly impaired' PETA's ability to carry out its

mission through frustration of that mission and a consequent drain on its resources." *Id.* (citing

*Havens Realty Corp.*, 455 U.S. at 379).

### 2.       Has Plaintiffs Suffered an Injury-in-Fact?

Applying the test laid out in *Tri-State Zoological Park*, 843 F. App'x at 495–96,

Plaintiffs have suffered an injury-in-fact sufficient to support organizational standing. NEAVS

has alleged two injuries it suffered as a result of Defendants' denial of Plaintiffs' Rulemaking

Petition that the Court finds sufficient to support standing in the instant case:[4] (1) the added

burden caused by the denial of information regarding the conditions under which primates are

being maintained in laboratories, whether those primates are suffering psychological distress,

and what measures are being taken to alleviate that distress, ECF No. 1 ¶ 11; *see also PETA v.*

*USDA*, 797 F.3d at 1095–96; and (2) the lack of standards from which NEAVS would educate

the public and promote the humane treatment of primates, resulting in NEAVS being required to

fill the void, ECF No. 1 ¶ 8, *see also Am. Anti-Vivisection Soc'y*, 946 F.3d at 619.  ALDF has

also sufficiently alleged injury-in-fact, as Defendants' denial of the Petition prevents ALDF from

being able to easily "calibrate its advocacy to particular problematic facilities." ECF No. 1 ¶ 15.

The Court discusses each of these injuries in greater depth below.

### a.       NEAVS's First Injury – Denial of Information

NEAVS' first injury can be summarized as an added burden of obtaining information

---

[4] The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. And Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006).

about the treatment of nonhuman primates in research facilities due to the lack of informative reports under the current rules. NEAVS's first injury is thus similar to the injury alleged in *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture* (hereinafter *PETA v. USDA*), a case in which the D.C. Circuit found that PETA had standing to challenge the USDA's refusal to apply the AWA to birds. 797 F.3d at 1094.

In *PETA v. USDA*, PETA alleged that it had standing because, *inter alia*: (1) "One of the primary ways in which PETA works to prevent cruelty to and inhumane treatment of animals used for entertainment is by educating the public, especially through informational services[;]" (2) "The USDA's AWA inspection reports are the primary source of information relied upon by PETA in preparing these educational materials[;]" (3) "[T]he USDA's failure to regulate birds under the AWA . . . deprives PETA of information on which it routinely relies in its efforts to educate the public[;]" (4) "This embargo on information regarding the conditions of birds used for exhibition directly conflicts with PETA's mission to prevent cruelty to and inhumane treatment of animals and frustrates its public education efforts[;]" (5) "As a result of the USDA's failure to regulate birds under the AWA, PETA is required to expend resources to obtain information about the conditions of birds . . . , including through investigations, research, and state and local public records requests[;]" and (6) "But for the USDA's failure to regulate birds under the AWA, PETA would not need to undertake . . . extensive efforts[.]" *Id.* at 1096 (internal quotation marks and citations omitted). The D.C. Circuit agreed with PETA's standing argument, holding that "the USDA's challenged non-action plainly impairs PETA's activities in a non-speculative manner by requiring PETA to divert and redirect its limited resources to counteract and offset [the d]efendant's unlawful conduct and omissions." *Id.* at 1095 (internal quotation marks and citations omitted).

Similar to the plaintiffs in *PETA v. USDA*, Plaintiffs here allege in their Complaint that:

- "NEAVS's most significant campaign for nonhuman primates focuses on exposing, and educating the public about, the substantial inhumane treatment these animals endure in research laboratories." ECF No. 1 ¶ 11.

- A primary source of information used in this campaign is "APHIS inspection records, annual reports by research facilities, and reports by the facilities' Institutional Animal Care & Use Committees—the entities mandated by the AWA to oversee the treatment of animals used in research[.]" *Id.*

- "However, because APHIS' current standards for primates are vague and unenforceable, the information NEAVS obtains is of little value." *Id.*

- "Had APHIS granted Plaintiffs' Rulemaking Petition, APHIS would have promulgated concrete standards regarding the psychological well-being of nonhuman primates that would have required the collection and generation of more detailed information regarding violations of such standards and what if any measures are being taken to ameliorate the distress and suffering of these primates." *Id.*

- Instead, "APHIS' denial of the Rulemaking Petition deprives NEAVs of key information that it needs to educate the public about (a) the conditions under which primates are being maintained in laboratories; (b) whether they are suffering psychological distress; (c) if so, what measures are being taken to alleviate such suffering; and (d) whether APHIS is meeting its statutory obligation to 'ensure' the humane treatment of these animals." *Id.*

- "This denial of information in turn impairs NEAVS' overall campaign to protect these animals and advocate for their placement in sanctuaries and to advocate for a transition to non-animal alternative testing protocols." *Id.*

- "Now, as a result of the agency's denial of [Plaintiffs'] Rulemaking Petition, NEAVS will have to divert additional resources . . . to obtain information about the ways [nonhuman primates used in research] are treated and what is being done to minimize their suffering." *Id.* ¶ 7.

These allegations support a conclusion that Defendants' denial of Plaintiffs' Rulemaking Petition and consequent refusal to upgrade the standards for the psychological well-being of nonhuman primates used in research have "perceptibly impaired [NEAVS's] ability" to "continue to educate the public" and to protect nonhuman primates used in research. *See PETA v. USDA*, 797 F.3d at 1095 (internal quotation marks omitted) (quoting *Am. Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 25); *see also Tri-State Zoological Park*, 843 F. App'x at 496–97. Thus,

Defendants' alleged misconduct has impacted NEAVS's "ability to operate as an organization, not [just] its theoretical ability to effectuate its objectives in an ideal world." *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 239 (4th Cir. 2020), *vacated by* 981 F.3d 311 (4th Cir. 2020) (granting the petition for rehearing en banc). "Because [NEAVS] has expended resources to counter these injuries, it has established" the first element of Article III organizational standing, injury-in-fact. *PETA v. USDA*, 797 F.3d at 1095; *see also Tri-State Zoological Park*, 843 F. App'x at 496 (finding that "a plaintiff has suffered an organizational injury if the challenged policy or practice frustrated both its purpose and caused a drain on resources").[5]

### b.      NEAVS's Second Injury – Lack of Standards

NEAVS also alleges a second injury: that the current rules fail to properly educate stakeholders, including inspectors, about the psychological needs of nonhuman primates used in research and how to identify primates in distress, which has forced NEAVS to fill the void created by the lack of clear standards. Plaintiffs' allegations regarding NEAVS's second injury are comparable to those of the Avian Welfare Coalition in *American Anti-Vivisection Society*, a case in which the D.C. Circuit, relying on its holding in *PETA v. USDA*, again found organizational standing. 946 F.3d 615 (D.C. Cir. 2020).

In *American Anti-Vivisection Society*, the Avian Welfare Coalition's (the "Coalition's") mission, was "to protect and raise awareness about the plight of captive birds, and to serve as an

---

[5] While the Fourth Circuit held in *Lane v. Holder* that "[t]o determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication[,]" 703 F.3d at 675, this case is distinguishable from *Lane*. In the instant case, educating the public about the suffering of nonhuman primates used in research is part of Plaintiffs' organizational mission. Plaintiffs are not educating the public in response to Defendants' denial of Plaintiffs' Petition, but in spite of that denial. According to the Complaint, Defendants' denial of Plaintiffs' Petition resulted in Plaintiffs being denied information that they need to effectively inform the public, in accordance with their missions, about how nonhuman primates used in research are being treated, and, consequently, Plaintiffs must now divert resources to counteract that obstacle and obtain information in other ways.

educational resource for the humane community, law-makers, and the general public." *Id.* at 619. Like PETA in *PETA v. USDA*, the Coalition "would pursue its objective by relying on USDA information—in this case the federal standards themselves." *Id.* The USDA standards "would provide the substance from which the Coalition would educate the public and promote humane treatment of birds, and would be used to gauge cruelty to birds." *Id.* (internal quotation marks, brackets, and citations omitted). However, because of the USDA's failure to enact regulations, the Coalition had "been compelled to fill the void by developing the guidance on topics like handling and restraint, feeding, housing, and stress minimization that federal standards would otherwise provide." *Id.* (internal quotation marks and citations omitted). These activities were not part of the Coalition's normal annual expenditures "until the efforts became necessary due to USDA's clear inaction" and have caused consequent drain on the organization's resources. *Id.* Thus, based on these facts, the D.C. Circuit held that the "USDA's alleged inaction has perceptibly impaired the Coalition's organizational interests by depriving it of key information that it relies on to fulfill its mission." *Id.* (internal quotation marks and citations omitted).

Analogously, in the instant case, Plaintiffs allege that "[o]ne of NEAVS' primary purposes is to end the suffering of nonhuman primates used in research[,]" which includes "educat[ing] the public, lawmakers, and others about the needs of primates used in research, and the suffering they endure." ECF No. 1 ¶ 6. Absent Defendants' denial of Plaintiffs' Petition, NEAVS would pursue its purpose by relying on APHIS's upgraded standards to "defin[e] when primates experience psychological distress, and delineat[e] what steps must be taken to address such distress." *Id.* ¶ 52. NEAVS would also rely on the upgraded standards to generate the information NEAVS needs to educate the public about whether primates used in research are suffering from psychological distress and what measures are being taken to alleviate that

suffering, *id.* ¶ 11. However, "[b]ecause of APHIS's refusal to upgrade the standards for the psychological well-being of nonhuman primates used in research . . . NEAVS will [] have to divert resources to develop training programs for APHIS inspectors regarding how to identify primate behaviors that indicate distress, stress, and suffering, and what actions must be taken to promote the psychological enrichment of these animals." *Id.* ¶ 8. Additionally, NEAVS will have to "divert resources to developing modules of training[,]" which will "be used to educate future veterinarians who will be working with these primates . . . about how to identify common signs of psychological distress and suffering in nonhuman primates and how to ameliorate these conditions." *Id.* ¶ 9. "This curriculum is necessary to fill the gap created by APHIS' lack of specific, enforceable standards that have long since been required by the AWA." *Id.* ¶ 8.[6] If APHIS had granted Plaintiffs' Petition, the upgraded standards would have "instruct[ed] inspectors how to identify and respond to primate distress and suffering[.]" *Id.* Consequently, absent Defendants' conduct, "NEAVS would not have to spend its own resources developing and implementing such training protocols." *Id.* These allegations again support the conclusion that Defendants' conduct "'perceptibly impaired' [NEAVS's] ability to carry out its mission through frustration of that mission and a consequent drain on its resources." *Tri-State Zoological Park*, 843 F. App'x at 496. Moreover, like in *American Anti-Vivisection Society*, NEAVS's second alleged injury "flows directly from USDA's failure to issue [ ]appropriate standards[,]" standards which Plaintiffs allege are "legally required by the AWA because the existing regulation simply fails to 'adequate[ly] promote the psychological well-being of primates' as required by the 1985

---

[6] Whether this gap actually exists is disputed. *See* ECF No. 7-1 at 13 n.2. However, a district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647.

amendments to AWA." ECF No. 10 at 23 (citing 7 U.S.C. § 2143(a)(2)(B)).[7]

### c.     ALDF's Injury – Inability to Calibrate Advocacy

Finally, ALDF alleges injury on the basis that the current rules require it to divert resources to data collection for its advocacy campaigns, when APHIS should be providing the necessary data. Plaintiffs' allegations regarding ALDF's injury are analogous to those of National Women's Law Center (the "NWLC") in *National Women's Law Center v. Office of Management and Budget*, 358 F. Supp. 3d 66 (D.D.C. 2019), a case in which the United States District Court for the District of Columbia ("D.D.C.") found standing.

In *National Women's Law Center*, the NWLC challenged the Office of Management and Budget's (the "OMB's") stay of a pay data collection. 358 F. Supp. 3d at 76. The NWLC is an organization that "educate[s] employers, the public, and policymakers about race and gender wage gaps, and has published numerous analyses and reports about workplace pay disparities." *Id.* at 75 (internal quotation marks and citations omitted). In *National Women's Law Center*, the NWLC claimed "that if OMB had not stayed the pay data collection NWLC would have been able to make its reports and advocacy more robust with additional data and analysis[,]" would have been able to "focus its resources, analysis, and advocacy on the jobs, industries, and regions where intervention is most urgent[,]" *id.* at 76, and "would more easily have been able to evaluate" claims of workplace discrimination, *id.* at 79. Instead, the NWLC had to make additional expenditures that it would not have made otherwise, including engaging with employers to encourage "voluntary self-audits of pay practices and internal wage gaps, in order to compensate for the self-evaluation of internal wage gaps that the EEO-1 pay data collection would have required employers to undertake." *Id.* at 80 (internal quotation marks and citations

---

[7] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

omitted). The D.D.C. concluded that these claims were sufficient to demonstrate injury in fact. Specifically, the D.D.C. found that (1) the NWLC had established it would have used the "pay data to advance [its] mission by using the data in [its] publications and as part of [its] public education and advocacy campaigns[;]" (2) "[t]he loss of pay data constitutes the type of informational harm the D.C. Circuit has found to be 'both concrete and specific to the work in which [the NLWC] is engaged[;]'" and (3) the NWLC had shown that it had used its resources to counteract the harm caused by the stay of the data collection. *Id.* at 79–80 (citing *PETA v. USDA*, 797 F.3d at 1095).

In the instant case, Plaintiffs allege that ALDF, in support of its mission "to protect the lives and advance the interest of animals[,]" ECF No. 1 ¶ 14, "has engaged in communication campaigns to highlight the failure of laboratories to provide proper care for primates[.]" *Id.* ¶ 15. To conduct these campaigns, "ALDF often relies on information generated from public record requests to investigate problematic facilities[.]" *Id.* In particular, "AWA inspection reports and other records are crucial sources of information." *Id.* ALDF also alleges that, "[i]f APHIS had specific enrichment standards for primates that in turn provided the public with reports on non-compliance, ALDF would be able to calibrate its advocacy to particular problematic facilities." *Id.* However, because of Defendants' denial of Plaintiffs' Petition, "ALDF will now have to spend additional time and resources[,]" *Id.* ¶17, in order to "to conduct rigorous investigations [through other means in addition to submitting FOIA requests] to determine the inadequacy of primate enrichment at specific facilities." *Id.* ¶ 15. Similar to NWLC's claims in *National Women's Law Center*, Plaintiffs' allegations have established that ALDF would have used the information generated from more specific and enforceable AWA standards for primates to advance its mission by using the information "as part of [its] public education and advocacy

campaigns[,]" *National Women's Law Center*, 358 F. Supp. 3d at 80, and by calibrating its

advocacy to particular facilities where the need is "most urgent[,]" *id.* at 76. Thus, ALDF has

suffered and continues to suffer concrete and specific harm to the work in which it is engaged.

*Id.* at 80. Finally, ALDF now must use its resources to counteract the harm caused by

Defendants' denial of the Rulemaking Petition. *Id.* Therefore, ALDF has suffered an injury-in-

fact.

Because the Court finds that Plaintiffs have alleged injury-in-fact, the Court turns to

redressability.[8]

## B.     Redressability

"An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury

will be redressed by a favorable decision.'" *Doe v. Virginia Dep't of State Police*, 713 F.3d 745,

755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528

U.S, 167, 181 (2000)). However, "no explicit guarantee of redress is required to demonstrate a

plaintiff's standing." *Id.* (internal quotation marks omitted) (quoting *Equity in Athletics, Inc. v.

Dep't of Educ.*, 639 F.3d 91, 100 (4th Cir. 2011). It is sufficient that "the court's decision would

'significantly affect' plaintiff's injuries." *Equity in Athletics, Inc.*, 639 F.3d at 100 (quoting *Nat'l

Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005)); *see also Massachusetts v.*

---

[8] Defendants argue both in their Motion to Dismiss and in their reply that the Court should evaluate whether
Plaintiffs have alleged an injury-in-fact under the doctrine of informational standing because, according to
Defendants, Plaintiffs' alleged injuries all ultimately stem from a deprivation of information. ECF No. 7-1 at 15–23;
ECF No. 15 at 9–13. However, the Court is unaware of any binding case law holding that organizational standing
based on injury in the form of deprivation of information is precluded by a lack of injury as defined by the
informational standing doctrine. In fact, even the non-binding case law on this issue is, at best, disputed. *Compare
Marino v. Nat'l Oceanic & Atmospheric Admin.*, 451 F. Supp. 3d 55 (D.D.C. 2020) (finding that where "[t]he
injuries alleged in the complaint are . . . unavoidably informational in nature, . . . the plaintiffs cannot establish
standing without meeting the requirements for informational injury."), *with Nat'l Women's Law Ctr.*, 358 F. Supp.
3d at 82 (acknowledging the uncertainty in the case law and finding that "a statutory right to withheld information"
is not "a necessary condition for both informational *and* organizational standing" (emphasis in original)). Moreover,
the Court's conclusion that Plaintiffs have sufficiently alleged injury-in-fact is supported by D.C. Circuit case law—
the case law on which both parties heavily rely.

*Env't Prot. Agency*, 549 U.S. 497, 526 (2007) (finding the redressability requirement met where the court's decision would reduce "to some extent" plaintiffs' risk of additional injury); *Federal Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) (finding respondents' injury redressable even if on remand the agency "might reach the same result in exercising its discretionary powers lawfully").

Plaintiffs allege in their Complaint that "[a]ll of [their alleged] injuries would be redressed if Plaintiffs prevail in this action, as APHIS would be required to reconsider its denial of Plaintiffs' Rulemaking Petition and to promulgate heightened standards to promote the psychological well-being of all primates used in research." ECF No. 1 ¶¶ 13, 21. These heightened standards will be both objective and enforceable. *Id.* Defendants respond in their Motion to Dismiss that Plaintiffs' alleged injuries, which are all ultimately based on deprivation of information, are not redressable because "it is not at all clear that a change in [the USDA's] standards would result in future agency records containing different information." ECF No. 7-1 at 24. The Court disagrees.

According to Defendants, "when the agency inspects a facility, the inspectors already examine and document all areas of care and treatment that are covered under the [AWA]." *Id.*[9] Thus, it stands to reason that new more objective and enforceable standards that require facilities to do more than just have an enrichment plan will likely, if not certainly, result in new areas of care and treatment that inspectors will have to document. *See* ECF No. 7-1 at 24 (internal quotation marks and emphasis omitted)). Moreover, with heightened standards, it is very likely, if not certain, that some facilities that were in compliance under the old standards will fall out of compliance. The USDA will then be required to disclose to the public "all reports or other

---

[9] However, the court now understands not every inspection covers all areas of the facility. ECF No. 19.

materials documenting [that] non-compliance[.]" ECF No. 71- at 22 (citing 7 U.S.C. § 2146a(b)). Therefore, although there is no explicit guarantee that Plaintiffs' injuries will be redressed, the Court's decision would reduce "to some extent" plaintiffs' risk of additional injury.

*Massachusetts v. Env't Prot. Agency*, 549 U.S. at 526.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is denied. A separate Order shall issue.

Date: <u>September 29, 2021</u>                          <u>      /s/                                      </u>
                                                                            GEORGE J. HAZEL
                                                                            United States District Judge